FILED
JUN - 7 2005
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**NICOLE NORRIS**
16111 Brandywine Road
Brandywine, Maryland 20613                :
                                          :   Case No.:
          Plaintiff,                      :
                                          :   **JURY DEMAND**
v.                                        :
                                          :
**DISTRICT OF COLUMBIA**                  :
**GOVERNMENT**                            :   CASE NUMBER 1:05CV01122
Executive Office of the Mayor             :
The John A. Wilson Building               :   JUDGE: Henry H. Kennedy
1350 Pennsylvania Avenue, N.W.            :
Washington, D.C. 20004                    :   DECK TYPE: Civil Rights (non-employment)
                                          :
          Defendant.                      :   DATE STAMP: 06/07/2005

JURY ACTION

## COMPLAINT

1. COMES NOW the Plaintiff, Nicole Norris, by and through counsel, The Law Office of Jimmy A. Bell, P.C. and Jimmy A. Bell, Esq., and respectfully presents this complaint of reverse racial discrimination against the Defendant, the District of Columbia Government, to enforce her rights under 42 U.S.C. § 1981 and the D.C. Human Rights Act.

## JURISDICTION

2. Jurisdiction of this court is based upon 42 U.S.C. § 1981 and the D.C Human Rights Act.

## VENUE

3. Venue is proper in the District of Columbia as the actions complained of occurred within said jurisdiction.

1

## FACTUAL BASIS OF COMPLAINT

4. Plaintiff is a citizen of the United States who resided at the address set forth in the caption above at all times material to this complaint.

5. Defendant District of Columbia is sued in its representative capacity for the University of the District of Columbia.

6. In December of 2003, Nicole Norris, a Caucasian student, applied to the nursing program at the University of the District of Columbia.

7. This process was extremely time-consuming as the only time the department accepted applications for the nursing program was the first and third Friday in December in order to begin the program in the fall semester of the following year.

8. The process included taking a 4-hour examination on April 3, 2004, writing an essay discussing why the applicant wanted to become a nurse, completion of all prerequisites, and a cumulative grade point average of at least 2.5.

9. Plaintiff Norris' grade point average at this time was 3.5.

10. Plaintiff Norris was a transfer student from Prince George's County Community College where she completed 47 credits.

11. Plaintiff Norris was in the Honor Society and took several honors courses.

12. Plaintiff Norris was on the Dean's List in spring and fall of 2001 with a grade point average of 3.68 and 3.59 respectively.

13. Plaintiff Norris also maintained a full-time job as an EMT for the District of Columbia Government.

14. During the first semester of nursing classes at the University of the District of Columbia, Plaintiff Norris had problems with Ms. Akintonde, one of the instructors.

15. Ms. Akintonde graded Plaintiff Norris' careplan, which is an extensive orderly paper written on every patient the students are assigned to, without justification of Ms. Norris' grade.

16. Next to each section of the careplan, Ms. Akintonde put the number of points earned for that section. The nursing diagnosis section was worth 20 points, and next to that section was the number 15 without any marks or notations on the paper telling Plaintiff Norris what was incorrect or what needed to be improved.

17. Plaintiff Norris immediately voiced her concern and Ms. Akintonde told Plaintiff she would look it over. Ms. Akintonde further told Plaintiff Norris to see her in her office after the next class. Plaintiff Norris did just that, expressing her concern again and demanding an explanation.

18. Ms. Akintonde then scratched out Plaintiff Norris' original grade and increased it to a B instead of a C. Ms. Akintonde's original explanation of the low grade was, "This is your first careplan. Nobody gets an A on their first one!"

19. This grading situation happened yet again when Ms. Akintonde graded Plaintiff Norris' clinical skills evaluation.

20. Ms. Norris was the only Caucasian student in the class and was receiving grades in the lower percentile of the class without justification.

21. On or about December 1, 2004, Plaintiff Norris decided to address the grading discrimination to the next chain of command as stated in the Student Nurse

Handbook due to the lack of resolution from Ms. Akintonde. Plaintiff Norris set up a conference with the Level I Coordinator, Ms. Cato. Ms. Cato advised Plaintiff Norris to put her concerns in writing and return them to her.

22. Plaintiff Norris subsequently wrote a letter addressing the issues she experienced with Ms. Akintonde. Plaintiff Norris also hand-delivered a copy of the letter to the President and Chairperson of Nursing, Dr. Webster on December 1, 2004.

23. Although Plaintiff had followed the proper procedures as outlined in the Student Nurse Handbook for reporting claims of grade discrimination, Plaintiff Norris never received a response.

24. Clinical classes were required for Mental Health Nursing as well as Maternal Newborn Nursing. Each clinical class was divided into small groups of 6-10 students and lasted 6 hours. Classes were sent to various hospitals across Washington, D.C., including St. Elizabeth's, Washington Hospital Center and the VA Medical Center.

25. Plaintiff Norris' clinical class was assigned to the VA Medical Center. On orientation day, Plaintiff's class was sent downstairs to get fingerprinted and to get their picture identification cards made.

26. This process was required by the VA Medical Center, but was not required by the other hospitals.

27. On February 7, 2005, Plaintiff Norris reported to lecture class on campus and was prepared to take her test for mental health lecture. When Plaintiff entered the class, Ms. Cato, the instructor, directed Plaintiff to go see Ms. Green-Ridley in her office.

28. Plaintiff Norris walked in and Dr. Joyner and Ms. Green-Ridley closed the door and told her there was an issue with her background clearance at the VA Medical Center, and that she could not do clinicals there.

29. Plaintiff Norris was then told that because she could not do clinicals, she would have to withdraw from the clinical class and then withdraw from the program.

30. Plaintiff Norris asked if she could at least go to class and take her exam and was denied this request although this was an on-campus lecture class and not a clinical.

31. Plaintiff Norris was informed that she could not take part in any other classes.

32. Plaintiff Norris was confused as to why she was refused the right to participate in all classes, including on-campus classes, when she was only unable to attend class at the VA Medical Center.

33. Plaintiff Norris was devastated and asked for the reasoning behind this decision. Plaintiff was told by Dr. Joyner and Ms. Green-Ridley that they did not have that information.

34. Plaintiff Norris was then given contact information for Phyllis Tomidus, head of security at the VA Medical Center. Ms. Norris called Ms. Tomidus at 9:45 a.m. and explained her situation. Ms. Tomidus told Ms. Norris she would call her back after talking with Suzanne, Director of Nursing Education.

35. At 9:51 a.m., Ms. Tomidus called Plaintiff Norris and said the issue was one Plaintiff would have to work out with her instructors. According to Ms. Tomidus, it was Plaintiff's instructors who were telling Plaintiff she could not do clinicals at the VA Medical Center, not the VA Medical Center making that decision.

36. Plaintiff Norris went back to Ms. Green-Ridley's office and explained what she was told over the phone by Ms. Tomidus. Ms. Green-Ridley assured Ms. Norris that the VA Medical Center had told her that Plaintiff was not allowed on site to do clinicals.

37. Ms. Green-Ridley stated that Plaintiff Norris had no choice but to withdraw from the nursing program. Ms. Green-Ridley also told Plaintiff to seek legal advice at the on-campus law school.

38. Plaintiff Norris waited for Dr. Joyner's class to end and went to Ms. Green-Ridley's office at 11am. Plaintiff asked Ms. Green-Ridley to call Suzanne, Director of Nursing Education, while Plaintiff was present.

39. After Ms. Green-Ridley hung up the phone, she informed Plaintiff that she did not know the reasoning, but Plaintiff could not return to the VA Medical Center.

40. Plaintiff Norris requested that Ms. Greene-Ridley put her statements in writing and the next day Plaintiff picked up a letter written by Ms. Greene-Ridley stating that Plaintiff could not return to the VA Medical Center.

41. The letter written by Ms. Green-Ridley stated:

> On Thursday February 3, 2005, Dr. JoAnn Joyner was informed by the security office at VA Medical Center that you had not cleared their security check and could not remain at VA for clinical. VA did not disclose the reason for the failed security check…Since you can not return to VA and the nursing program can not place you at another facility not knowing the security problem, we recommend you withdraw from your nursing courses this semester while you address this problem. We also recommend you seek legal counsel at the David A. Clarke Law School.

42. Plaintiff Norris went directly to the law school and explained what she was told to do. The woman whom Plaintiff spoke with then stated: "I don't know why they sent you here! There is nothing that we can do for you!"

43. The next day, Plaintiff Norris went to the VA Medical Center and spoke face-to-face with Ms. Tomidus. Ms. Tomidus again informed Ms. Norris that she had no idea why Ms. Norris was unable to participate in clinicals at the VA Medical Center. Ms. Tomidus once more stated that the issue would have to be taken up with Plaintiff's instructors.

44. A few days later, Plaintiff Norris learned that she was not the only student the VA Medical Center supposedly denied the opportunity to participate in clinicals. Plaintiff called Taquita Williams, an African American student, to discuss their similar situations.

45. Plaintiff Norris went back and forth with the VA Medical Center and University of the District of Columbia without success in resolving the situation.

46. Notwithstanding the fact that Plaintiff Norris does not have a criminal record that would keep her from being licensed as a nurse, the University of the District of Columbia does not have special admissions restrictions based on this factor.

47. Plaintiff Norris has not been given a rationale based on any University policy or other law for the informal request that Plaintiff resign from the nursing program.

48. Plaintiff Norris was not given any method of appealing the arbitrary decision, nor was she provided the due process afforded to other students facing disciplinary or academic charges.

49. Plaintiff Norris asked to be placed in another hospital, but was told that the school could not send her to another hospital.

50. Plaintiff Norris' friend, Jessica Rivera, went to Ms. Cato and asked if she could switch clinical classes with Plaintiff so that Plaintiff could be sent to another hospital that did not require a criminal background check. This request was denied.

51. Plaintiff Norris offered to get a copy of her criminal record, but Ms. Green-Ridley was not interested.

52. Ms. Green-Ridley went on to tell Plaintiff Norris how life was unfair, that she did not want to hear what Ms. Norris had to say, and that she had been there before.

53. A few weeks passed and Plaintiff Norris called Taquita Williams, the African American student, again. Ms. Williams informed Plaintiff Norris that she had been attending classes regularly so that she would not get too far behind.

54. Plaintiff Norris was shocked because she was told that she could not attend classes until her issue was resolved.

55. Although Plaintiff Norris was not permitted to obtain a security clearance and return to class, the actions of the school in regards to allowing Ms. Williams, an African American student, to obtain a security clearance and return to class gives the appearance that Ms. Williams was receiving special treatment from the school on account of her race.

56. Plaintiff Norris' letters were being ignored; she was never contacted about her letters and was never given any constructive advice to help remedy her situation.

57. A cursory review of Plaintiff Norris' police record would have revealed nothing contained therein that would prevent Plaintiff from becoming licensed as a nurse. Nor was there anything in Plaintiff's record that would have prevented her from attending the University of the District of Columbia.

58. Plaintiff Norris is not a convicted felon, she did not commit academic dishonesty, she did not violate any code of conduct, nor did she did engage in any unethical practices in the classroom or clinical setting.

59. The University of the District of Columbia was not acting in accordance with any written policy or procedure when it denied Plaintiff Norris the opportunity to participate in clinicals at the VA Medical Center and forced Plaintiff to withdraw from the school's nursing program.

60. Moreover, the fact that the University of the District of Columbia failed to respond to Plaintiff Norris' claims of grade discrimination based on her race (Caucasian), and then forced Plaintiff to withdraw from the nursing program, gives the appearance that the school was retaliating against the Plaintiff for making the initial complaint of grade discrimination.

61. Plaintiff Norris began to look into attending other schools. However, given the fact that most schools will not accept nursing credits from other programs, this means she will have to repeat her entire first semester.

62. Plaintiff Norris called the District of Columbia Board of Nursing and explained her situation. Plaintiff told the woman whom she spoke with everything concerning her background and the woman informed Plaintiff that nothing she mentioned would prevent her from getting her RN license.

## COUNT I

### UNLAWFUL DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

63. Plaintiff Norris re-pleads and re-alleges paragraphs 1 through 62, with the same force and effect as if set forth separately at length herein.

64. Plaintiff made herself available to obtain the benefits of education ordinarily offered by Defendant District of Columbia Government.

65. The facts and circumstances surrounding Plaintiff's forced withdrawal from the University of the District of Columbia's nursing program rationally support an inference of unlawful discrimination based on her race (Caucasian).

66. Plaintiff did not enjoy the services, privileges and benefits offered to persons outside of her protected class.

67. Defendant District of Columbia Government acted in a discriminatory manner that a reasonable person would find objectively unreasonable.

68. Defendant District of Columbia Government intentionally discriminated against Plaintiff in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, on account of her race (Caucasian).

## COUNT II

### VIOLATION OF THE D.C. HUMAN RIGHTS ACT § 2-1402.41

69. Plaintiff re-pleads and re-alleges paragraphs 1 through 68 with the same force and effect as if set forth separately at length herein.

70. D.C. Human Rights Act § 2-1402.41 explicitly states that it shall be unlawful for an educational institution "[t]o deny, restrict, or to abridge or condition the use of, or access to, any of its facilities and services to any person otherwise qualified,

wholly or partially, for a discriminatory reason, based upon the race, color...of any individual."

71. Plaintiff made herself available to receive the services and educational opportunities ordinarily provided by Defendant District of Columbia Government.

72. The facts and circumstances surrounding Plaintiff's forced withdrawal from the University of the District of Columbia's nursing program rationally support an inference of unlawful discrimination.

73. As a direct and proximate result of the aforesaid deprivation of Plaintiff's rights under the D.C. Human Rights Act § 2-1402.41, the Plaintiff suffered severe damages.

74. Plaintiff will have to repeat her entire first semester and may now have to repeat certain science classes that have time limitations.

75. Plaintiff has endured and continues to endure severe emotional distress.

76. Defendant District of Columbia Government intentionally discriminated against Plaintiff on account of her race (Caucasian).

### RELIEF SOUGHT

77. Plaintiff Norris re-pleads and re-alleges counts 1 through 76, with the same force and effect as if set forth separately at length herein.

78. Plaintiff requests the following relief:

79. Compensatory damages in the amount of $5,000,000.00.

80. Pre- and post-judgment interest.

81. The costs of litigation, including reasonable attorney's fees and expert witness fees.

82.  Such other relief that may be just.

## JURY DEMAND

83.  Plaintiff demands a trial by jury.

Respectfully submitted,

Jimmy A. Bell, Esq.
Law Office of Jimmy A. Bell, P.C.
9610 Marlboro Pike
Upper Marlboro, MD 20772
Tel.: (301) 599-7620
Fax: (301) 599-7623
Bar No. MD 14639

Counsel for Plaintiff